UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY,

   Plaintiff,

v.

Case No. 1:06-cv-836
Hon. Hugh W. Brenneman, Jr.

GOLDSTEIN ENTERPRISES, LLC,
et al.,

   Defendants.
                  /

**OPINION**

   This matter is now before the court on plaintiff North American Specialty Insurance Company's ("North American's") motion for summary judgment as to defendants William B. Swendsen and Dwayne Smith (docket no. 28). Defendants did not file a response to the motion. Pursuant to court order, this motion will be decided on the present record without hearing. *See* docket no. 31.

   **I. The second amended complaint**

   North American sets forth the following allegations in its second amended complaint. On June 13, 2005 and October 19, 2005, defendants Goldstein Enterprises, LLC ("Goldstein Enterprises"), Scott Goldstein ("Goldstein"), William Swendsen ("Swendsen") and Dwayne Smith ("Smith") executed indemnity agreements in favor of North American. Compl. at ¶ 9. In consideration for the promises as set forth in these indemnity agreements, North American issued payment and performance bonds naming Goldstein Enterprises as principal. *Id.* at ¶ 10. As of November 27, 2006, North American received claims on four bonds issued to Goldstein Enterprises,

nos. S2058929, S2058866, S2057165, and S2053744, totaling $ 803,282.18. *Id.* at ¶ 12. North American continues to investigate these claims, which are identified as follows:

| **Project** | **Bond Number** | **Claimant** | **Amount** |
|---|---|---|---|
| West Water Street Watermain Replacement | S2058929 | National Waterworks | $ 368,662.21 |
| | | Mid-Michigan Materials, Inc. | $ 21,310.57 |
| | | Michigan Petroleum Technologies | $ 17,723.03 |
| | | Blue Water Asphalt | $ 51,423.56 |
| Jordan Lake Road Sewer | S2058866 | National Waterworks | $ 40,062.86 |
| | | ISCO Industries, LLC | $ 163,667.02 |
| | | Smith & Loveless, Inc. | $ 63,868.26 |
| 2005 Water System Improvements Contract A Watermains | S2057165 | National Waterworks | $ 64,218.04 |
| Greenville West 3 Sewer and Water Extension | S2053744 | Plummer's Environmental Services, Inc. | $ 786.63 |
| | | Perrin Excavating | $ 5,060.00 |
| | | R&T Yard Preparation | $ 6,500.00 |

*Id.*

As of October 31, 2006, North American paid claims totaling $ 96,125.21on these bonds naming Goldstein Enterprises as principal. *Id.* at ¶ 13. North American also incurred costs,

expenses, consulting fees and attorney fees on the amount of $ 3,726.25 relating to the bonds. *Id.* at ¶ 14. North American will continue to incur costs, expenses, and fees until all matters pertaining to the bonds are resolved. *Id.* at ¶ 15.

North American has alleged five counts against defendants: Count I (contractual indemnification); Count II (common law indemnification); Count III (specific performance of the collateral security provision in the indemnity agreements); Count IV (common law quia timet); and, Count V (injunction for access to defendants' books and records). Both Swendsen and Smith raised affirmative defenses in their answers, as well as cross-claims for fraud against Goldstein and Goldstein Enterprises. *See* docket nos. 11, 16.[1]

## II. Goldstein bankruptcy

Goldstein and Goldstein Enterprises have filed relief under Chapter 7 of the Bankruptcy Code and plaintiff's claims against those two defendants are precluded by the automatic stay provisions of 11 U.S.C. § 362. *See In re Goldstein Enterprises, LLC*, No. 07-04436 (Bankr. W.D. Mich.) and *In re Scott M. Goldstein*, No. 07-4566 (Bankr. W.D. Mich.). Accordingly, these proceedings are stayed as to those two defendants.

## III. Summary Judgment standard

This matter is now before the court on North American's motion for summary judgment as to defendants Swendsen and Smith under Counts I and III. Specifically, North American seeks summary judgment against Swendsen and Smith, jointly and severally, for

---

[1] In its brief, North American states that "it does not appear" that Smith filed an answer to the second amended complaint. *See* North American's brief at fn. 2. North American filed its second amended complaint on December 12, 2006. *See* docket no. 4. Smith filed his answer on January 18, 2007. *See* docket no. 11. After reviewing the docket sheet and the pleadings, it appears to the court that Smith's answer was in response to the second amended complaint.

$815,300.56 and a court order directing them to post collateral security with North American in the amount of $519,260.00.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

Neither Swendsen nor Smith have filed responses to North American's motion for summary judgment. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2nd Cir. 1996). However, when a motion for summary judgment is unopposed, neither the Rules nor the case law require the trial court to "conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

**III.    Discussion**

**A.    Count I (contractual indemnification)**

The record reflects that Swendsen and Smith signed identical indemnity agreements in which they agreed to indemnify North American for losses incurred on various bonds naming North American as the surety. Smith's agreement is dated June 13, 2005 and notarized the same day. *See* Smith's indemnity agreement (attached to North American's brief as Exh. A). Swendsen's agreement is dated October 6, 2005 and was notarized October 25, 2005. *See* Swendsen's indemnity agreement (attached to North American's brief as Exh. A). Both Smith and Swendsen admitted that they signed their respective indemnity agreements. *See* Smith's Answer at ¶ 9; Swendsen's Answer at ¶ 9.

The indemnity agreements provide that the indemnitors, Goldstein Enterprises, Goldstein, Swendsen and Smith:

> have requested and do hereby request [North American], hereinafter referred to as Surety, to execute or procure the execution of such bonds, undertakings or recognizances (all of which are hereinafter included within the term "bond or bonds") as have been and as may hereafter be applied for directly or through an agent, attorney or other representative, solely or as co-adventurer with others, by any of the Indemnitors, or by any person, firm, corporation or association whose name shall, for that purpose, have been furnished to the Surety by any of the Indemnitors, it being understood and agreed that this instrument shall cover all bonds so applied for and executed, whether or not this instrument is referred to or mentioned in connection therewith.

Indemnity Agreements at page 1 (attached to North American's brief as Exh. A).

In addition, the agreements provide in pertinent part as follows:

> The indemnitors will exonerate, hold harmless, and indemnify the Surety from and against any and all liability, loss, costs, damages, fees of attorneys and consultants, and other expenses, including interest, which the Surety may sustain or incur by reason of, or in consequence of, the execution of such bonds and any renewal, continuation or successor thereof, including but not limited to, sums paid

or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, expenses paid or incurred in enforcing the terms hereof, in procuring or attempting to procure a release from liability, or in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid.

*   *   *

The Surety shall have the exclusive right to determine whether any claim, liability, suit or judgment made or brought against the Surety or the Indemnitors, or any one of them, on any such bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision thereon, if made in good faith, shall be final and binding upon the Indemnitors. The Surety shall have no obligation to tender its defense to any Indemnitor. If the Surety elects not to tender its defense to any Indemnitor, the Indemnitors shall nevertheless remain liable to the Surety for any and all loss, costs, damages, interest, and expenses, including but not limited to attorneys' fees and consultants' fees resulting from the Surety's investigation and/or defense. An itemized statement of payments made by the Surety for any of the purposes specified herein, sworn to by an officer of the Surety, or the voucher or voucher's of such payment, shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety for such payments, with interest.

*Id.* at ¶¶ 2, 8.

Brian Golbach, a vice president of North American, states in his affidavit that North American has paid the following claims arising from five payment bonds issued on Goldstein Enterprises jobs:

| | |
|---|---|
| Bond No. S2058929 ("Port Huron Payment Bond") | $ 611,166.01 |
| Bond No. S2057112 ("Mendon Payment Bond") | $ 99,746.59 |
| Bond No. S2058866 ("Lakewood Payment Bond") | $ 300,680.69 |
| Bond No. S2053744 ("Greenville Payment Bond") | $     1,039.80 |
| Bond No. S2057165 ("Williamston Payment Bond") | $   51,584.59 |

Golbach Aff. at ¶¶ 1-13 (attached to North American's brief as Exh. B). North American has recovered $248,917.12 of the claims paid on the Lakewood Payment Bond, which resulted in a net loss of $ 51,763.57. *Id.* at ¶ 9. After adjusting for this recovery, North American has suffered a total of $815,300.56 in losses on payments made to claimants under the payment bonds naming Goldstein Enterprises as principal. *Id.* at ¶ 14. In addition, North American has received claims that remain unpaid on the Reed City, Williamston, Port Huron, and Lakewood payment bonds totaling $519,260.00. *Id.* at ¶ 15.

The right of indemnification may arise from an express contract. *Hubbell, Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, 249 Mich. App. 288, 291, 642 N.W.2d 700 (2001). An indemnification contract involves the promise of the indemnitors (in this case, Goldstein Enterprises, Goldstein, Swendsen and Smith) to compensate the indemnitee (North American) for the indemnitee's losses suffered on the indemnitors' behalf. *In re V. Pangori & Sons, Inc.*, 53 B.R. 711, 715 (Bankr. E.D. Mich. 1985). *See generally, Langley v. Harris Corporation*, 413 Mich. 592, 596, 321 N.W.2d 662 (1982) ("[i]ndemnity relates to the obligation of one person or entity to make good a loss another has incurred while acting for its benefit or at its request").

The ordinary rules of contract construction apply to indemnity contracts. *Title Guaranty & Surety Co v. Roehm*, 215 Mich. 586, 592, 184 N.W. 414 (1921). "A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Rory v. Continental Ins. Co.*, 473 Mich. 457, 468, 703 N.W.2d 23 (2005) (emphasis in original). *See Edison Sault Elec. Co. v. Manistique Pulp & Paper Co.*, 278 Mich. 592, 596, 270 N.W. 799 (1937) ("if the terms of a contract are expressed in words of such clear and definite meaning that there is no ambiguity, in the absence of fraud or mistake . . . the terms of the

contract control"). Thus, "[a] contract of indemnity should be construed so as to cover all losses, damages, or liabilities to which it reasonably appears to have been the intention of the parties that it should apply, but not to extend to losses, damages, or liabilities which are neither expressly within its terms nor of such character that it can reasonably be inferred that they were intended to be within the contract." *Roehm*, 215 Mich. at 592 (internal quotes omitted).

It is undisputed that Swendsen and Smith signed agreements to indemnify North American from "any and all liability, loss, costs, damages, fees of attorneys and consultants, and other expenses, including interest, which [North American] may sustain or incur by reason of . . . the execution of such bonds . . . including but not limited to, sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, expenses paid or incurred in enforcing the terms hereof, in procuring or attempting to procure a release from liability, or in recovering or attempting to recover losses or expenses paid or incurred . . ." Indemnity Agreements at ¶ 2. The terms of the indemnity agreements are clearly expressed. In the absence of any ambiguity, the court will enforce the agreements as written. *See Rory*, 473 Mich. at 468; *Edison Sault Elec. Co.*, 278 Mich. at 596; *Roehm*, 215 Mich. at 592.

North American's second amended complaint seeks damages for losses arising from payment bond nos. S2058929, S2058866, S2057165 and S2053744, which the Golbach affidavit establishes as totaling $781,553.97. While the Golbach affidavit also establishes a loss of $99,746.59 on the Mendon Payment Bond (no. S3057112), the court notes that North American's second amended complaint did not seek damages arising from that particular bond. Accordingly, any losses suffered by North American on bond no. S3057112 are not part of this action.

Viewing the evidence in the light most favorable to the non-movants, the court finds that there is no genuine issue of material fact that pursuant to the terms of their indemnity agreements, Swendsen and Smith are liable to indemnify North American for losses totaling $781,553.97. Neither Swendsen nor Smith dispute that North American issued the bonds pursuant to the indemnity agreements or that it paid claims on the four bonds at issue in this action totaling $781,553.97. Golbach's affidavit is sufficient to demonstrate prima facie evidence that North American exercised good faith in paying these claims pursuant to ¶ 8 of the indemnity agreements. *See Transamerica Insurance Company v. Bloomfield*, 401 F.2d 357, 362 (6th Cir. 1968) ("[p]rovisions in indemnity agreements granting to the indemnitor the right to compromise and settle claims, and providing that vouchers and other evidence of payment shall be prima facie evidence of the propriety thereof, have been upheld as not against public policy and enforced by the courts"). Neither Swendsen nor Smith present any evidence demonstrating that North American did not exercise good faith in paying the claims.

Accordingly, North American is entitled to summary judgment against Swendsen and Smith in the amount of $781,553.97.[2]

### B. Count III (posting collateral security)

In Count III, North American seeks an order directing Swendsen and Smith to post collateral security for unpaid claims asserted against payment bond nos. S2058929,

---

[2] For the reasons stated below, Swendsen and Smith's affirmative defenses do not affect their liability for these losses.

9

S2058866, S2057165 and S2053744.³  Swendsen, Smith and the other indemnitors agreed to post collateral security pursuant to paragraph 3 of the indemnity agreements, which provides as follows:

> If the Surety receives any claim or lawsuit asserting liability, or sets up a reserve to cover any liability, claim asserted, suit or judgment under any such bond, the Indemnitors will, immediately upon demand, and whether or not the Surety shall have made any payment therefore, deposit with the Surety a sum of money equal to such claim or reserve and any increase thereof as collateral security on such bond, and such sum and any other money or property which shall have been or shall hereafter be pledged as collateral security on any such bond, shall be available, in the discretion of the Surety, as collateral security on all bonds coming within the scope of this instrument, or for any other indebtedness of the Indemnitors to the Surety; and any such collateral security shall be held subject to the terms of the Surety's regular form of receipt for collateral, which is by reference made a part hereof.

Indemnity Agreement at ¶ 3.

When a claim is made upon a bond, a collateral security provision in an indemnity agreement allows the surety to demand funds from the indemnitors to hold in reserve, and, if the claim must be paid, to use those funds to pay the loss. *See Safeco Ins. Co. of America v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984); *United States Fidelity and Guaranty Company v. Diaz Matos*, No. 05-1851, 2007 WL 878571 at *7 (D. P.R. March 21, 2007). "Sureties are ordinarily entitled to specific performance of collateral security clauses." *Safeco Ins. Co.*, 739 F.2d at 433. *See, e.g.*, *American Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 300 (2nd Cir. 1989) ("[w]here liability had not yet been determined but claims were expected, the surety had no legal remedy under that provision for an indemnification award, but it did have an equitable remedy for specific performance of the collateral security provision").

---

³ The court notes that the Golbach affidavit identifies $519,260.00 of unpaid bond claims, including claims made on a "Reed City" bond. Because North American's second amended complaint does not allege any claims arising from a "Reed City" bond, it has no basis to seek collateral security on that bond.

Under the indemnity agreements, as a condition precedent to the indemnitors' posting of collateral security, the surety (North American) was required to make a demand upon the indemnitors to post security. Indemnity Agreement at ¶ 3. *See, e.g., Colonial Surety Company v. MedTek, Inc.*, No. Civ. A. 03-6377, 2005 WL 459642 at *3 (E.D. Pa. Feb. 25, 2005) (the surety's obligation to make a demand for collateral under a similar general indemnity agreement was a condition precedent to the indemnitor's obligation to provide the collateral). The occurrence of a condition precedent is a matter that must be specially pled. *See* Fed. R. Civ. P. 9(c) ("[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed"). *See e.g.*, *Redfield v. Continental Casualty Corp.*, 818 F.2d 596, 610 (7th Cir. 1987) ("[a]n essential allegation of a complaint based upon a breach of contract is that the plaintiff performed all contractual conditions required of him") *East River Const Corp. v. District of Columbia*, 183 F.Supp. 684, 685 (D.C.D.C. 1960) (plaintiff's count for breach of contract is defective and subject to dismissal where the complaint fails to allege the occurrence of a condition precedent as required under Rule 9(c), i.e., that plaintiff gave certain written notice required under the contract).

North American's second amended complaint does not allege that the conditions precedent (i.e., its demands that Swendsen and Smith post collateral security) "have occurred or been performed." Rather, North American incorporates its initial demands in its second amended complaint as follows:

> 30. Demand is hereby made of the Defendants to post collateral security in the amount of $803,282.18, representing the amount of the claims presently pending against [North American], within twenty days following the receipt of this Complaint.

>    31.   In the event the Defendants fail to place collateral security in the amount of $803,282.18 with [North American] within twenty days after being served with this Complaint, the Defendants shall be deemed in breach of the Indemnity Agreements.

Second amended compl. at ¶¶ 31-32.

It is clear from the allegations of the second amended complaint that North American did not demand Swendsen and Smith to post collateral security prior to filing suit, but rather intended to have the second amended complaint act as the "demand" for posting the security. North American has not complied with requirement of Fed. R. Civ. P. 9(c), because it fails to allege that the conditions precedent "have occurred or been performed." Accordingly, North American's motion for summary judgment will be denied as to Count III.

### C.   Swendsen's and Smith's affirmative defenses

Both Swendsen and Smith have filed affirmative defenses of failure to state a claim, want or failure of consideration, mistake, lack of mutual assent to contract and fraud. *See* docket nos. 11, 16. They have also filed counterclaims against Goldstein and Goldstein Enterprises, alleging that Goldstein misrepresented the nature of the indemnity agreements and fraudulently obtained their signatures on those agreements. *Id.* For the reasons stated below, none of these affirmative defenses preclude North American from obtaining summary judgment on the indemnity agreements.

#### 1.   Fraud

North American contends that Swendsen and Smith's affirmative defense of fraud is legally insufficient to bar its recovery under the indemnity agreements. "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense-on which the defendant bears the burden of proof at trial-a plaintiff may satisfy its Rule 56 burden by

12

showing that there is an absence of evidence to support an essential element of the non-moving party's case." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54-55 (2nd Cir. 1994) (internal quotation marks and brackets omitted), citing *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30 (2nd Cir.1993) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

> While whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). After all, in cases where there is an absence of evidence to support an essential element of a defense, with respect to that defense "there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the [defendant's affirmative defense] necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

*Giammettei*, 34 F.3d at 54-55.

Swendsen and Smith admitted that they signed the indemnity agreements at issue in this action. Swendsen Answer at ¶ 9; Smith Answer at ¶ 9. In their affirmative defense of fraud, both Swendsen and Smith allege that their signatures were obtained by fraudulent means, and incorporate the allegations in their respective counterclaims against Goldstein. Swendsen alleges that on October 6, 2005, Goldstein, an attorney and the primary shareholder, principal and authorized agent of Goldstein Enterprises, called him and stated, "I need you to stop by my office on your way home to sign some paperwork." Swendsen counterclaim at ¶¶ 3-4. When Swendsen arrived at the office, Goldstein advised him as follows, "This is the paperwork you need to sign, its what we talked about to keep our bonding going . . . they also want to verify that you are going to be the foreman." *Id.* at ¶ 6. Goldstein reassured Swendsen that by signing and initialing where told, Swendsen was verifying that he would be the foreman on various Goldstein Enterprises jobs. *Id.* at ¶ 7. Swendsen, whose reading level is very low, reasonably relied on Goldstein's representations

13

and signed the indemnity agreement, which he thought was verifying his position as foreman. *Id.* at ¶¶ 8-11.

Smith alleges that on or about June 12, 2005, he received a telephone call from Goldstein Enterprises that Goldstein wanted to meet with him on June 13th to discuss a construction job in which Smith would be the foreman, and to complete some paperwork. Smith counterclaim at ¶¶ 2-3. At the June 13th meeting, Goldstein told Smith that "The bonding company wants me to verify that you are going to be the foreman on the project, so they need your signature and initials on this paperwork." *Id.* at ¶ 5. Goldstein assured Smith that by signing where told, he was simply acknowledging and verifying that he would be the foreman on the "Monroe job." *Id.* at ¶ 6. Goldstein told Smith that "We're a new company, and they just need you to verify that you are the foreman; otherwise we cannot get the bonding." *Id.* at ¶ 7. Smith, who has neither a high school diploma nor a GED and reads at a 6th or 7th grade level, reasonably relied on Goldstein's representations and signed the indemnity agreement, which he thought was verifying his position as foreman. *Id.* at ¶¶ 8-11.

Swendsen and Smith's "fraud" affirmative defense includes claims of both "fraud in the inducement" and "fraud in the execution." Fraud in the inducement involves a claim in which a person knows the terms of a written instrument, but was induced to enter into the contract because of false representations made to him. *Rood v. Midwest Matrix Mart, Inc.*, 350 Mich. 559, 567, 87 N.W.2d 186 (1957). To establish a claim for fraud in the inducement, Swendsen and Smith would need to prove six elements:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the

14

>defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 304 (6th Cir. 2008), citing *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich.App. 239, 733 N.W.2d 102 (2006). If fraud in the inducement is proven, then the transaction is voidable. *Bricklayers' Pension Trust Fund-Metropolitan Area v. Chirco*, 675 F.Supp. 1083, 1086 (E.D. Mich. 1987).

On the other hand, fraud in the execution involves a situation in which a person "has been induced to sign a contract as the result of fraud and deceit concerning the contents thereof." *Id. See, e.g., Paul v. Rotman*, 50 Mich.App. 459, 464, 213 N.W.2d 588 (1974) ("'Fraud in the execution' or factum means the proponent of the instrument told the signatory thereof that the instrument really didn't mean what it clearly said, and that the signatory relied on this fraud to his detriment"). To establish fraud in the execution, Swendsen and Smith would need to establish that they executed the agreements with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms, as well as excusable ignorance of the contents of the writing signed. *Bricklayers' Pension Trust Fund-Metropolitan Area*, 675 F.Supp. at 1087. *See, e.g., Collucci v. Eklund*, 240 Mich.App. 654, 659-660, 613 N.W.2d 402 (2000) (fraud in the execution claim failed when "[t]here is no evidence that plaintiff did not know that he was signing a release" and "never claimed that he did not understand that the document he was signing was a release"). When fraud in the execution exists, the agreement is void *ab initio. Bricklayers' Pension Trust Fund-Metropolitan Area*, 675 F.Supp. at 1086.

North American has provided the court with deposition testimony regarding the alleged fraud surrounding the execution of the indemnity agreements. At his deposition, Swendsen testified that he was asked to come to Goldstein's office to sign paperwork regarding his status as

a permanent employee of Goldstein Enterpirses.  Swendsen Dep. at 43-45 (attached to North American's brief as Exh. D).  When Swendsen arrived, Goldstein presented him with the indemnity agreement.  *Id.* at 45.  Swendsen did not "really" read the agreement and did not ask Goldstein to explain it.  *Id.* at 45-46.  Swendsen asked Goldstein if the document "was going to put [him] on the line for anything," to which Goldstein responded "no" and reassured Swendsen that it was "more or less" just to verify Swendsen's employment.  *Id.*

Smith testified that his boss, Mr. Nylander, told him to go to an office, where Goldstein, a lawyer, directed him to sign and initial the indemnity agreement. Smith Dep. at 6-9, 47-50 (attached to North American's brief as Exh. C).[4]  Smith's friend, Todd Lacosse, was present in the office with Goldstein, and told Smith that it was "okay" to sign the agreement.  *Id.* at 49.  Smith did not see the indemnity agreement before signing it and did not read it.  *Id.* at 50.

Viewing these facts in the light most favorable to the non-movants, Goldstein's misrepresentations do not provide the basis for an affirmative defense of either fraud in the inducement or fraud in the execution.  Neither Swendsen nor Smith claim that North American fraudulently induced them to sign the indemnity agreements.  It is undisputed that the alleged fraud was perpetrated by their co-indemnitor, Goldstein, who misrepresented the contents of the indemnity agreements and reassured both Swendsen and Smith that there was no reason to be concerned about the content of the agreements.  Under Michigan law, the "[f]ailure to read a contract document provides a ground for rescission only where the failure was not induced by carelessness alone, but instead was induced by some stratagem, trick, or artifice <u>by the parties seeking to enforce the</u>

---

[4] The indemnity agreement is identified as "deposition exhibit 1." While Smith does not explicitly identify "deposition exhibit 1" as his indemnity agreement, it is undisputed that his testimony relates to the execution of that agreement.

16

contract." *Moffit v. Sederlund*, 145 Mich. App. 1, 8, 378 N.W.2d 491 (1985) (emphasis added), citing *Otto Baedeker & Associates, Inc. v. Hamtramck State Bank*, 257 Mich. 435, 441, 241 N.W. 249 (1932). Because North American did not induce Swendsen and Smith to sign the indemnity agreements, their fraud in the inducement affirmative defense fails.

Similarly, there is no evidence that North American secured their signatures by perpetrating a fraud in the execution of the indemnity agreements. Rather, it was Goldstein, a co-indemnitor, who secured the signatures after telling Swendsen and Smith that the indemnity agreements were employment verification documents. Where a co-indemnitor falsely represents the contents of an indemnity agreement to obtain the signatures of other co-indemnitors for the purpose of securing a performance bond from a surety company, these false representations cannot form the basis to rescind the indemnity agreement unless the co-indemnitor making the representations is shown to be an agent of the surety company. *See All Florida Surety Company v. Coker*, 88 So. 2d. 508 (Fla. 1956) (*en banc*). Here, there is no evidence that Goldstein acted as an agent for North American to secure the signatures. Accordingly, North American has demonstrated the absence of evidence to support an essential element of Swendsen and Smith's affirmative defense of fraud in the execution.

To summarize, neither Swendsen nor Smith have provided a factual basis to support affirmative defenses of fraud in the inducement or fraud in the execution. Accordingly, North American is entitled to summary judgment with respect to the affirmative defense of fraud.

### 2. Remaining affirmative defenses

Finally, North American does not seek summary judgment on the remaining affirmative defenses, i.e., failure to state a claim upon which relief can be granted, want or failure

to consideration, lack of mutual assent to contract, and mistake. Swendsen and Smith have provided no evidence to establish the elements of these affirmative defenses. Accordingly, these defenses do not bar North American from obtaining summary judgment with respect to the contractual indemnification claim.[5]

### IV. Conclusion

For reasons stated above, North American's motion for summary judgment against defendants Swendsen and Smith (docket no. 28) will be **GRANTED** as to Count I in the amount of $781,553.97 and **DENIED** as to Count III.

An order consistent with this opinion shall be issued forthwith.


Dated: March 25, 2008                    /s/ Hugh W. Brenneman, Jr.
                                         HUGH W. BRENNEMAN, JR.
                                         United States Magistrate Judge

---

[5] In this regard, the court notes that the affirmative defense of "failure to state a claim" presents a legal question that could have been addressed in a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Rademacher v. Colorado Association of Soil Conservation Districts Medical Benefit Plan*, 11 F.3d 1567, 1571 (10th Cir. 1993) ("[a] naked assertion that a plaintiff's complaint fails to state a claim will not, by itself, excuse a defendant's failure to timely present and argue available defenses to the district court").